Case 4:07-cv-00077-A   Document 20   Filed 07/06/07   Page 1 of 16   PageID 194

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JUL - 6 2007

CLERK, U.S. DISTRICT COURT
By _____
Deputy

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| CURTIS MOORE, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | NO. 4:07-CV-077-A |
| | § | |
| NATHANIEL QUARTERMAN, | § | |
| Director, Texas Department | § | |
| of Criminal Justice, | § | |
| Institutional Division, | § | |
| | § | |
| Respondent. | § | |

MEMORANDUM OPINION
and
ORDER

Came on for consideration the petition for writ of habeas corpus ("petition")[1] filed by Curtis Moore ("Moore"), an inmate in the Texas Department of Criminal Justice, Institutional Division, who is under sentence of death. The court has determined that the petition should be denied for the reasons set forth in this memorandum opinion and order.

I.

Procedural History

Moore was convicted of capital murder by a jury in the 297th Judicial District Court of Tarrant County. On November 9, 1996, pursuant to the jury's answers to the special issues

---

[1] While the undersigned recognizes that 28 U.S.C. § 2254 contemplates the filing of an "application" for writ of habeas corpus, the practice of the Northern District of Texas has long been instead to use the term "petition." Consistent with this now ingrained practice, the undersigned refers to Moore's application under 28 U.S.C. § 2254 for writ of habeas corpus as the "petition" and uses the term "petitioner" in lieu of "applicant."

set forth in Texas Code of Criminal Procedure Article 37.071, §§ 2(b) and (e), the trial judge sentenced Moore to death. On April 28, 1999, the Texas Court of Criminal Appeals affirmed Moore's conviction on direct appeal. See Moore v. State, No. 72,705 (Tex. Crim. App. April 28, 1999), cert. denied, 543 U.S. 1164 (2005). He subsequently unsuccessfully challenged his conviction through state and federal habeas proceedings. See Ex parte Moore, No. 42, 801-01 (Tex. Crim. App. 1999); Moore v. Jackson, No. 4:99-CV-960-A (N.D. Tex., Jul. 13, 2000), aff'd sub. nom., Moore v. Cockrell, 275 F.3d 45 (5th Cir. 2001), 2001 WL 1267482, cert. denied, 535 U.S. 1040 (2002). In April 2002 Moore filed a second state application for writ of habeas, which again proved unsuccessful. See Ex parte Moore, No. 42, 801-02 (Tex. Crim. App. 1999), cert. denied, Moore v. Texas, 536 U.S. 966 (2002).

On June 20, 2002, the Supreme Court, in Atkins v. Virginia, 536 U.S. 304 (2002), held that the execution of the mentally retarded is unconstitutional and constitutes cruel and unusual punishment under the Eighth Amendment. After the issuance of Atkins, in June 2003, Moore, urging that he is mentally retarded, filed a third state habeas application. The Texas Court of Criminal Appeals found that the application satisfied the successive writ restrictions and remanded the case to the trial court for considerations of Moore's Atkins claim. The

State and Moore agreed to waive a live hearing and submitted the issue to the trial court for resolution on the evidence. On September 22, 2006, the trial court adopted the State's proposed findings and conclusions, with the sole exception that it found one IQ score to be 67 and not 68, and recommended that relief be denied. See SH[2] at 667. The Texas Court of Criminal Appeals adopted all but one of the trial court's findings and conclusions, denying habeas relief on January 31, 2007. See Ex parte Wilson, No. 42, 801-03 (Tex. Crim. App. January 31, 2007) (rejecting without explanation finding No. 105).[3]

On February 1, 2007, Moore filed the current, successive, federal-habeas proceeding before this court, simultaneously seeking authorization from the Fifth Circuit to proceed with a third habeas petition. The Fifth Circuit granted such authorization on February 9, 2007.

---

[2] A copy of Moore's state-court records was forwarded to the court on March 7, 2007. The "SH" reference is to the records of Moore's state-habeas proceeding. Citations to "SH" are followed by the relevant page number(s).

[3] Finding No. 105 includes various proposed findings/criticisms of one of Moore's purported experts, Dr. Garnett, on mental retardation. See SH at 656, ¶ 105. The court is perplexed as to why the Texas Court of Criminal Appeals did not adopt this finding, because, from the court's direct review of Dr. Garnett's opinions, the findings appear to be quite warranted. Among other things, Dr. Garnnett did not personally examine Moore and his opinions are largely conclusory. See Pet'r's Successor Pet. for Writ of Habeas Corpus at 6-13 (repeating verbatim unsworn version of Dr. Garnett's affidavit). Regardless, given the sizeable record of other evidence as to Moore's intellectual functioning, any potential issue concerning Dr. Garnett's opinions is inconsequential.

II.

Underlying Facts

On direct appeal, the Texas Court of Criminal appeals well summarized the underlying facts of the crimes for which Moore was sentenced to death:

> The State's main witness, Darrel Hoyle (Darrel), testified that he and his friends, Henry Truevillian (Henry) and Roderick Moore[4] (Roderick) met [Moore] late in the evening of November 29, 1995. [Moore] was with his nephew, Anthony Moore (Anthony). The five men talked about making a cocaine deal. They were to meet to make a deal at a house on Pate Street that belonged to [Moore's] sister. Henry and Roderick rode with Darrel in his beige, four-door Cutlass, and [Moore] and Anthony rode in a blue Oldsmobile that [Moore] said he had borrowed from a friend.
>
> When they arrived at the Pate Street house, Darrel and Anthony waited outside and talked. The three other men went inside. About five minutes later, Darrel and Anthony entered. The five men talked in the kitchen for a while, and then [Moore] and his nephew went into the bathroom together. Moments later, [Moore] came out of the bathroom shouting, "This is a jack," which in street language means a robbery. [Moore] took $150 from Darrel and $5 from Henry. While [Moore] held a gun on Darrel, Henry, and Roderick, he told Anthony to tie up the three men. Anthony tied the victims' hands and feet. [Moore] then told Anthony to open the trunk of Darrel's car so that he could put them in there. [Moore] put Darrel and Henry in the trunk. From what Darrel could ascertain from inside the trunk, [Moore] drove, Anthony rode in the front passenger seat, and Roderick rode in the back seat.
>
> After a while the car stopped, and Darrel heard [Moore] say that the car was out of gas. [Moore] went to get gasoline and told Anthony to keep the gun pointed at Roderick. [Moore] returned about ten minutes later, put the gasoline in the car, and drove

---

[4]Roderick Moore is not related to [Moore].

4

on. The car stopped sometime later, and Darrel assumed that they were at Roderick's house because he heard Roderick's girlfriend, LaTanya Boone (LaTanya), scream after he heard a gun shot. Darrel assumed that LaTanya and Roderick were put into another car, because he did not hear them again. The car stopped again, at which time [Moore] asked Darrel and Henry if they were trying to get loose. [Moore] then drove on.

Some time later, around 2:00 a.m. on November 30, the car stopped again on Wilbarger Street in southeast Tarrant County. Darrel heard [Moore] get out of the car. Moments later the trunk lid was opened, and Darrel saw [Moore] fire a gun at him and Henry and then close the trunk lid. Darrel heard Henry say, "Oh, I'm hit." After the shooting stopped, [Moore] opened the trunk again and poured gasoline on Darrel and Henry. [Moore] closed the trunk until it was open only enough to stick his hand in, and he lit the gasoline. Darrel heard the flick of the lighter and then his and Henry's clothes caught on fire. [Moore] tried to close the trunk lid, but Darrel kicked until it opened.

Darrel pulled Henry and himself out of the trunk, and Darrel began to run. He realized that he was on fire, and he dropped to the ground and rolled the fire out. [Moore] then gave chase, while Darrel ran into the woods on the other side of the street. [Moore] came after him, stepped on his neck, and threatened his life. Darrel played dead; [Moore] left him alone and walked back to the cars. Darrel then got up, ran farther into the woods, and found a hiding place. He watched his car burn up and then saw what appeared to be an explosion. When [Moore] realized that Darrel had gone, Darrel saw him remove his shirt and heard [Moore] yell that he was going to kill Darrel. He heard sirens and saw [Moore] run toward the highway. He saw a blue Oldsmobile that looked like the one that [Moore] had been driving earlier in the day, drive toward the highway. When the fire trucks and police arrived, Darrel ran up to them. He was able to tell a fireman his and Henry's name, but was unable to tell him anything else because he was in shock and badly burned on about sixty percent of his body. Darrel was flown to a local hospital by helicopter. Officers did not get a statement from him until several days later.

5

>    Later that morning, the police were called to a crime scene on David Strickland Street, not far from the Wilbarger site, where the bodies of LaTanya and Roderick were found shot with a nine-millimeter gun.
>
>    Darrel gave a statement to the police when he regained consciousness six days after he was shot and burned. When Darrel gave his statement to the police, he told them Anthony's street name (Kojak) and that Anthony attended O.D. Wyatt High School. He also told police that he did not know [Moore's] name, but that he knew that [Moore] drove a pink truck. With that information, the police were able to find [Moore] and Anthony and arrest them on December 12. After his arrest, Anthony led police to the nine-millimeter gun that a ballistics expert testified had been used to kill LaTanya and Roderick.

See Moore v. State, No. 72,705 (Tex. Crim. App. April 28, 1999), at 11-13.

### III.

### Scope of Review

On April 24, 1996, the President signed into law the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"). Under AEDPA, the ability of federal courts to grant habeas relief to state prisoners is narrowly circumscribed:

>    (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
>        (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal

6

>    law, as determined by the Supreme Court of
>    the United States; or
>
>    (2)   resulted in a decision that was
>    based on an unreasonable determination of
>    the facts in light of the evidence
>    presented in the State court proceeding.

AEDPA, § 104(3) (codified at 28 U.S.C. § 2254(d)).  AEDPA further provides:

>    (e)(1)  In a proceeding instituted by an
>    application for a writ of habeas corpus by a person
>    in custody pursuant to the judgment of a State court,
>    a determination of a factual issue made by a State
>    court shall be presumed to be correct.  The applicant
>    shall have the burden of rebutting the presumption of
>    correctness by clear and convincing evidence.

AEDPA § 104(4) (codified at 28 U.S.C. § 2254(e)(1)).

Having reviewed the petition, the response, the record, and applicable authorities, the court finds that none of Moore's grounds has merit.

IV.

Ground for Relief

Moore's sole ground for relief is that he is ineligible for execution under Atkins v. Virginia, 536 U.S. 304 (2002), because he is mentally retarded.

V.

Discussion

A.   Atkins

In Atkins v. Virginia, 536 U.S. 304 (2002), the Supreme Court banned the execution of the mentally retarded.  However,

7

"[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." Atkins, 536 U.S. at 317.  The obvious challenge -- which the Supreme Court, in turn, left to the states to meet -- is how to determine which offenders fall within the range of mental retardation sufficient to render a sentence of death unconstitutionally cruel.  Id.

The State of Texas uses a three-part definition borrowed from the American Association of Mental Retardation ("AAMR")[5] and generally codified in Section 591.003 of the Texas Health and Safety Code.  Specifically, under this definition, "a person is mentally retarded if he has three characteristics: (1) 'significantly subaverage general intellectual functioning' (an IQ of about 70 or below);[6] (2) 'related limitations in adaptive [behavior],' and (3) onset of the above two characteristics before age eighteen."  See Hall v.

---

[5] The Supreme Court cited to this definition in Atkins.  See Atkins, 536 U.S. at 308 n.3.  The State of Texas also uses this definition in death-penalty cases.  See Ex parte Briseno, 135 S.W.3d 1, 6-8 (Tex. Crim. App. 2004).  While both respondent and Moore cite to the AAMR definition, its extremely slight differences, if any, to Section 591.003 of the Texas Health and Safety Code do not merit discussion.

[6] "Under the AAMRR classification system, individuals with IQ scores between 50-55 and 70 have 'mild' retardation.  Individuals with scores between 35-40 and 50-55 have 'moderate' retardation.  'Severely' retarded people have IQ scores between 20-25 and 35-40, and 'profoundly' retarded people have scores below 20-25."  See Penry v. Lynaugh, 492 U.S. 302, 308 n.1 (1989), abrogated on other grounds, Atkins v. Virginia, 536 U.S. 304 (2002).

State, 160 S.W.3d 24, 36 (Tex. Crim. App. 2004) (citation omitted).

Although the first and third elements are relatively self-explanatory, the second element is perhaps not. Adaptive behavior generally refers to "the effectiveness with or degree to which a person meets the standards of personal independence and social responsibility of the person's age and cultural group." See Tex. Health & Safety Code. Ann. § 591.003(1) (Vernon 2003). The Texas Court of Criminal Appeals has identified certain criteria -- the Briseno factors -- to use in assessing whether a prisoner's adaptive functioning is sufficiently limited. These include: (1) whether those who knew him during his developmental state considered him to be mentally retarded; (2) whether he has formulated and carried out plans; (3) whether his conduct shows that he is a leader; (4) whether his conduct in response to external stimuli is rationale and appropriate, regardless of whether it is socially acceptable; (5) whether he responds coherently and rationally to questioning; (6) whether he can effectively lie to further his or others' interests; and (7) whether the crime of conviction required planning and complex execution. See Ex parte Briseno, 135 S.W.3d 1, 8 (Tex. Crim. App. 2004). Notably, the Fifth Circuit has cited approvingly to the Briseno factors. See, e.g., Moreno v. Dretke, 450 F.3d 158,

9

164 (5th Cir. 2006), <u>cert. denied</u>, ___ U.S. ___, 127 S. Ct. 935 (2007).

To state a successful claim under <u>Atkins</u>, all three prongs of the definition must be met. See <u>In re Salazar</u>, 443 F.3d 430, 432 (5th Cir. 2006). And it is Moore's burden to show that each prong is met. <u>Hall</u>, 160 S.W.3d at 38.

B.  <u>Respondent's Motion to Dismiss</u>

As a preliminary matter, the court must address respondent's motion to dismiss Moore's petition on the ground that it fails to meet the successive-petition requirements of 28 U.S.C. § 2244(b).[7]  See Resp't's Resp. to Successive Pet. at 10-11. In the context presented here, those requirements include that: (1) the claim presented in the petition has not previously been presented; (2) the claim relies on a new, retroactive rule of constitutional law; and (3) there is a prima-facie showing of mental retardation. See <u>In re Mathis</u>, 483 F.3d 395, 396-97 (5th Cir. 2007).

Because respondent concedes that the first two requirements are met, the only issue is whether Moore has made out a prima-facie showing of mental retardation. This, in turn, merely requires Moore to make a "'sufficient showing of

---

[7]While the Fifth Circuit Court of Appeals granted Moore permission to file this successive petition, this "grant is tentative." See <u>In re Morris</u>, 328 F.3d 739, 741 (5th Cir. 2003). This court is required independently to assess whether the requirements for filing a successive petition have been met: "The district court is thus the second 'gate' through which the petitioner must pass before the merits of his or her motion is heard." <u>Id.</u>

possible merit to warrant fuller exploration . . .'" In re Mathis, 483 F.3d at 397 (citation omitted). While, for the reasons stated below, Moore's evidence of alleged mental retardation is not enough to mount a successful constitutional challenge, Moore has made an adequate showing to warrant fuller exploration of his claim. As well summarized by the Fifth Circuit, the successive petitions in which a prima-facie Atkins claim has been found *not* to exist typically involve sparse records with no expert diagnosis of mental retardation. Id. at 398-399 (citation omitted). Here, Moore does present, inter alia, evidence of several IQ tests, two of which are arguably suggestive of mild retardation, along with an expert diagnosis of mental retardation. In short, Moore's evidence is just enough to make out a prima-facie claim of mental retardation. Respondent's motion to dismiss Moore's petition is thus denied.

C. <u>Moore's Petition Should Be Denied on the Merits</u>

In his petition and brief in support, Moore reviews the evidence as to his mental capacity. See Moore's Successive Pet. for Writ of Habeas Corpus at 6-19. The State does the same in its response. See Resp't's Resp. to Successive Pet. at 5-30. There is no reason for the court to do so again here. Briefly though, the record reflects that Moore was subjected to IQ testing five to six times in the time period

11

between 1980 to 2004 with two full scale results below 70 (67[8] and 63) and the other four results above 70 (72 twice) and (76 twice).[9] With respect to the score of 67, Dr. Finn, who administered the test, questioned whether that result was accurate given that Moore was hostile and uncooperative. Consequently, his view was that Moore's performance IQ of 82 was probably a better indicator of his ability to function.[10] See SH at 647, ¶¶ 11-13. As to the score of 63, the only other score below 70, it was the result of testing performed by Dr. Rosin, Moore's expert during the state-habeas proceedings. After waiting long enough to rule out any practice effect from Dr. Rossin's testing -- i.e. the artificial inflation of one's IQ from learning the test, the State's expert, Dr. Price, tested Moore again and found his full scale IQ to be 76. After evaluating the score of 63 yielded by Dr. Rossin's testing, Dr. Price was of the opinion that the score of 63 was the result of poor performance in testing. Id. at 153-154, ¶¶ 6-7. His conclusion is bolstered

---

[8]While in his briefing Moore asserts that this score is 68, the court is deferring to the trial court's finding that it is 67. See SH at 667.

[9]The full scale IQ score is a combination of verbal and performance components. Moore's reply contains a useful summary of his IQ test results. See Pet'r's Reply Br. to Resp't's Answer at 2-3.

[10]Although Dr. Finn revised his opinion during the state-habeas proceedings, the court concurs with the trial court that his revised opinion is not credible. See SH at 648, ¶ 22.

by the fact that the score of 63 was considerably out of line with four other IQ results above 70.

The evidence as to whether Moore suffered from adaptive behavior deficits also conflicted. On the one hand, there was, inter alia, evidence of poor grades and evidence from interested family members and a case worker at the juvenile facility where Moore was housed in his youth that Moore had adaptive limitations. On the other hand, there was credible expert evidence that he did not. See SH at 152 and 154, ¶¶ 8-9. In addition, that Moore did not have significant deficits in adaptive behavior was amply supported by the application of the Briseno factors.[11]

For example, the crime itself implicates at least four of the seven Briseno factors, including Moore's ability to formulate and execute plans, to do so in the role of leader, to respond to external stimuli rationally, and to execute a crime that required planning and complex execution. See Ex parte Briseno, 135 S.W.3d at 8 (outlining the second, third, fourth, and seventh Briseno factors). Moore's crime entailed the murder of three people and the attempted murder of a fourth over the course of several hours and several location

---

[11]Perhaps because the Briseno factors as applied to Moore are so fatal to his claim of mental retardation, Moore urges that they "run counter to the psychological reality and the diagnostic criteria." See Pet'r's Reply Br. to Resp't's Answer at 9. Moore, however, cites to no legal authority in support of this assertion.

13

changes. And Moore, as the leader, arranged for the meeting with the victims, robbed them, and instructed his nephew to tie them up. Further, Moore was determined to complete the crime even after the car died, instructing his nephew to guard the hostages while he got gasoline. Then, in calculated fashion, Moore set about completing the murders and destroying all the evidence by burning up the car with two victims still inside, chasing after one burning victim after he escaped.

Moore's trial testimony also speaks volumes as to his ability to answer questions coherently and lie in an effort to protect himself, two more of the Briseno factors. Id. (outlining the fifth and sixth Briseno factors). In answering his lawyer's questioning, Moore was articulate and coherent. See SH at 177-176. Indeed, Moore was able to diagram the scene in which he robbed the victims in amazing detail, placing all the people and physical objects on site down literally to the kitchen sink. Id. at 189-192. Moore's elaborate lies to exonerate himself from his heinous crimes ultimately culminated in his accusing his seventeen-year old nephew, whom Moore described as "slow" but not quite "mentally retarded," as the one who shot at the victims and caused the fire. Id. at 221 and 263. According to Moore, he even

14

heroically tried to free the men in the burning car, resulting in burns to himself. <u>Id.</u> at 257-258.[12]

Regarding the final requisite characteristic concerning the time of onset, while there was some scant evidence that any deficits in Moore's intellectual or adaptive functioning manifested prior to his turning eighteen-years old, there was a dearth of evidence that Moore's family ever acted in accordance with the belief that he was mentally retarded before he turned eighteen.  Further, Moore was never diagnosed as mentally retarded before the age of eighteen.

In short, having independently reviewed all of the evidence, the court concludes that, while there is evidence indicative of perhaps mild mental retardation, there is ample evidence that Moore is not mentally retarded.  Consequently, the state court's finding that Moore is not mentally retarded was not unreasonable.  <u>See</u> 28 U.S.C. § 2254(d)(2).  Moreover, these findings are presumed to be correct unless controverted by Moore with clear and convincing evidence.  <u>See</u> 28 U.S.C. § 2254(e)(1).  Moore has failed to meet that burden here.[13]

---

[12] Additional evidence of Moore's adaptive skills include numerous lucid love letters that he wrote from prison to two women with whom, unbeknownst to the other, he was carrying on with at the same time.  <u>See</u>, <u>e.g.</u>, SH at 379-430.

[13] The court views the issue of Moore's mental capacity as one of fact. Even if viewed as a mixed issue of fact and law, the state-court decision on this issue was not contrary to or otherwise involved an unreasonable application of clearly established federal law.  <u>See</u> 28 U.S.C. § 2254(d)(1).

VI.

Order

For the reasons discussed herein,

The court ORDERS that Moore's petition be, and is hereby, denied.

SIGNED July 6, 2007.

_____
JOHN McBRYDE
United States District Judge